H. J. Wolf v. Commissioner. J. Wolf v. Commissioner. S. Schnitzer v. Commissioner. R. Schnitzer v. Commissioner.
H. Wolf v. Commissioner
Docket Nos. 6262, 6263, 6264, 6265.
United States Tax Court
1946 Tax Ct. Memo LEXIS 77; 5 T.C.M. (CCH) 816; T.C.M. (RIA) 46227; September 23, 1946
*77 Robert T. Jacob, Esq., 917 Public Service Bldg., Portland 4, Ore., and S. J. Bischoff, Esq., for the petitioners. T. M. Mather, Esq., for the respondent ARUNDELL
Memorandum Findings of Fact and Opinion These proceedings involve deficiencies in income taxes for the calendar year 1941, as follows: Docket No.
Deficiency
6262
$5,596.94
6263
5,466.83
6264
5,580.09
6265
5,466.83
The sole issue, common to all four dockets, concerns the reasonableness of certain salaries paid by a partnership, of which the petitioners were members, to four individual employees of the firm. Findings of Fact The petitioners are husbands and wives and members of a co-partnership, doing business under the firm name and style of Alaska Junk Company at Portland, Oregon. Each petitioner had a one-fourth interest in the firm. They filed individual income tax returns with the collector of internal revenue for the district of Oregon. The partnership, Alaska Junk Company, was originally organized by petitioners, H. J. Wolf and S. Schnitzer, in 1911. Its business was the buying and selling of all sorts of salvage metals and materials. The original partnership continued *78 until 1925 or 1926 when the wives of the partners, petitioners Jennie Wolf and Rose Schnitzer, were taken into the firm. That partnership is still in existence except that petitioner Jennie Wolf, the wife of H. J. Wolf, died in April 1945. The business of the partnership has grown steadily from sales of $315,000 in 1932 to sales of something over $2,000,000 in 1941. The petitioning couples were the parents of children nearly all of whom had at some time or other spent a good deal of time in connection with the partnership business. The boys of each family had worked after school and during summer vacations at various and sundry jobs for the partnership. It was the plan of the parents that their children should learn the business and eventually carry it on. Neither Mrs. Schnitzer nor Mrs. Wolf took an active part in the management or conduct of the business. Mr. Schnitzer and Mr. Wolf jointly carried the responsibilities of the business until their sons had finished school and started working full time for the partnership. Beginning in about 1930, they began shifting responsibility and authority to the boys. In 1939, Mr. Schnitzer became quite ill and did very little work in connection *79 with the partnership business thereafter. Petitioner H. J. Wolf likewise had substantially retired from the active conduct of the business by 1940. In 1941, the partnership affairs were, to a very large extent, managed and directed by the sons and sons-in-law of the respective partners. The growth and expansion of the company after 1930 was attributable, at least in part, to the efforts and educational background of the employees whose salaries are under consideration. The following four employees of the partnership are the individuals the reasonableness of whose compensation is in issue: Manuel Schnitzer is the son of petitioners Sam Schnitzer and Rose Schnitzer and was 34 years of age in 1941. After graduating from the University of Oregon, where he studied business administration, he studied law at the Northwestern Law School in the City of Portland. He completed his college education in 1928 and immediately upon completion he entered into the business of the partnership, devoting full time thereto and at all times since that date. He went out on wrecking jobs, worked in the pipe shop as a common laborer, sold merchandise, etc. Prior to the time he graduated from college he *80 received no fixed compensation but only a few dollars a week for spending money. He served as a bookkeeper for some time and in 1932 started going out on buying trips. He traveled around the United States, engaging mostly in buying and making contacts with factories. As time went on he was authorized to make rather large purchases on his own responsibility and based upon his own judgment. He became expert in the work. He had the right to make payment for purchases on the spot and carried a checkbook and was authorized to sign checks on the bank account of the firm. At times he spent from $100,000 to $150,000 on a trip in the purchase of merchandise. Toward the end of 1940 he was offered a job at $25,000 a year by another responsible firm engaged in a line of business similar to that of the partnership. In 1941, he was being paid at the rate of $5,400 a year, and as an inducement to the continuation of his services with the partnership he was told, along with other individuals here under consideration, that a bonus of $10,000 would be given to him. He had received lesser amounts in earlier years and received the increased compensation only after he had given the partners to understand *81 that he would not continue to work for them unless a substantial increase was forthcoming. Monte L. Wolf is the son of the petitioners H. J. and Jennie Wolf. He was born in 1909 and was 32 years of age in 1941. After graduating from the University of Oregon in 1931, where he majored in business administration, he spent his full time in connection with the partnership business. He started at a salary of $37.50 a month. He has worked continuously for the firm. His father taught him the business, and took him along on buying trips in earlier years while he was still attending school and able to devote only his spare time to the partnership. He likewise had authority to purchase goods and materials for the firm and was empowered to use his own judgment in handling deals up to $300,000. He went out, looked at logging camps, sawmills, and plants of all sorts, for the purpose of ascertaining their value for salvage materials and for junk, and instructed the dismantling crews in the operation. In 1941, he received a salary of $5,400 and a bonus of $10,000, making total compensation of $15,400. This was considerably in excess of the compensation which he had been paid for earlier years and *82 was given to him by the partners in order to retain his services, which were extremely valuable to the success of the partnership. Bernard Levin is a son-in-law of petitioners Sam and Rose Schnitzer. He married their daughter in 1938 but did not go to work for the firm until June 18, 1940. He was employed by the firm until 1944, when he went into the Navy. After his discharge from the Navy in March 1946, he was again working for the partnership but at the time of the hearing he had arranged to terminate his services in order to go into business for himself. Although he had one definite offer and two other definite possibilities of employment, all of which he considered superior financially and otherwise to employment by the partnership, he concluded that he could do still better in business for himself. He is a graduate of the University of California and had taken extension courses in hydraulics and engineering as applied to the pipe business. His father had been engaged in Los Angeles in a line of business similar to that of the partnership, and Levin had had a good deal of experience under his father. While he worked for his father he had been at various times in charge of dismantling *83 jobs, including oil refineries, and that experience stood him in good stead during his employment by the Alaska Junk Company. His first assignment for the petitioners was the dismantling and sale of two mills and railroad properties located at Spirit Lake, Idaho. He remained on that job 16 months and was able to accomplish an economic dismantling job and sold much of the material and salvage on the spot. The property had cost the petitioners $96,000 and $50,000 was spent in connection with the salvaging of materials. The partnership realized about $300,000 from the disposition of that property. Levin had authority to exercise his own judgment as to how the work was to be done, what was to be sold and prices to be placed thereon, and with respect to abandonment and salvage. When the Idaho project was completed he went back to Portland and was warehouse superintendent in charge of the machine shop and steel department. After the office manager left the organization he moved up to the office as assistant manager. During 1941 he received a salary of $4,200 and participated in a bonus to the extent of $10,000 as did the employees above referred to. Irving I. Cohon is the son-in-law of *84 petitioners H. J. and Jennie Wolf. He entered the employ of the partnership in 1934. Prior thereto he attended the University of Oregon, and after he was married and working for the firm he studied mathematics and general engineering at Oregon Technical School at night. There also he made special studies of irrigation and became expert in the designing and installation of modern irrigation systems. He developed an extensive irrigation business for the partnership which, in normal times, occupied about seven to eight months of his time during that year. He also engaged in the work of dismantling mills and, in addition, was in charge of the pipe department, which ordinarily does about 30 per cent of the entire volume of the partnership business. His duties in that capacity consisted of the buying and selling of pipes, valves, fittings, and plumbing supplies. He supervised some 30 or more employees in his department. In 1940 he felt that he was underpaid in proportion to his duties and responsibilities and threatened to quit unless he received more compensation. About the middle of 1941, in order to induce him to remain with the business, the partners promised to pay him a bonus of $10,000 *85 in addition to his salary of $4,200. The principal income-producing factors of the Alaska Junk Company were the buying and selling activities. During the taxable year 1941, when the elder Wolf and the elder Schnitzer were in virtual retirement, nearly all of these activities were carried on by the four sons and sons-in-law whose compensation is in issue. Persons of comparable experience and ability employed by other concerns engaged in similar lines of business were paid compensation ranging from $20,000 to $40,000 per year in 1941. The total amount of compensation ($59,200) paid the four employees in question in 1941 amounted to less than three per cent of net sales of over $2,000,000. Net income for the year, after payment of all salaries, wages, and bonuses to all employees of the business, amounted to slightly more than $250,000, during which time invested capital averaged approximately $500,000. The respective amounts of salary and bonus paid to Manual Schnitzer, Monte Wolf, Bernard Levin, and Irving Cohon represented reasonable compensation for services actually rendered by them in 1941. Opinion ARUNDELL, Judge: As stated at the outset, the only issue in these cases *86 is the reasonableness of salaries paid to the four sons and sons-in-law of the petitioning partners. It is purely a fact question and has, in effect, been disposed of by our finding that the compensation was reasonable. We need not, therefore, elaborate our conclusion with a repetition of all the evidence the record affords. Suffice it to say that this record presents a picture of sons and sons-in-law, at least three of whom had practically grown up in a family business, with the fourth having had a like experience in a similar business; of the four gradually assuming more responsibilities and finally taking almost complete charge of the management and conduct of the business as advancing age and illness forced the retirement of the parents from active participation; of conflict with the elders over their policy of paying meager compensation to family relations because of their belief that it was wiser to plow back earnings into the business to conserve capital; of tempting opportunities to earn much more on the outside; and of final capitulation by the elders to the juniors in the matter of compensation in order to retain the latter's valuable services in the business. The evidence *87 leaves us with no doubt that it would have been extremely difficult, if not almost impossible, to find men of the necessary experience, ability, and degree of skill required to replace these four employees at any price; that the growth and expansion of the business were due in considerable part to their industry and to new methods and ideas which they brought to the business and put into operation; and that particularly in the taxable year, by which time the elder Wolf and Schnitzer had ceased active participation, their efforts in buying and selling and their ability to locate and purchase scarce materials were the major factors in the production of the substantial volume of sales of the business and the higher margin of profits. Far from supporting the view that the salaries paid these employees were excessive, the record furnishes ample support for the conclusion that the compensation actually received by them was less than that paid to persons of comparable experience and responsibility employed by other concerns engaged in a similar business. It follows that respondent erred in disallowing any portion of the compensation paid by the partnership to these employees. Decisions *88 will be entered for the petitioners.